-24-

More significantly, grievant calls upon us to look at this period in its entirety. He points out that he had no regular assignment and no EER during this time, which he attributes to reprisals against him because of his whistle blowing activities.

We accept the Department's contention that assignments to overcomplement are not unusual, particularly in the case of an officer whose tour is suddenly cut short in mid-cycle. Nevertheless, it is difficult to accept the argument that an eighteen-month period on overcomplement without a regular assignment, is not out of the ordinary. Grievant has not presented sufficient evidence to prove any of the specific acts of reprisal he alleges, *e.g.*, on the part of the director of [office] or of grievant's CDO. But the circumstantial evidence provided by the length of time before grievant was given a new regular assignment and the fact that that assignment had to be made by forced placement strongly suggests the possibility that some extraneous factors were at play -- that some office or corridor scuttlebutt was making it difficult for grievant to obtain a new position.

Grievant attributes everything he alleges to his reputation as a whistle-blower, but he offers nothing to support this argument other than his obviously strong convictions. These are not sufficient. We find it more probable that if there were, in fact, some

-25-

events or actions affecting grievant's assignments, they were his curtailment from [post] and the letter of reprimand in his file charging that he had used his professional position for personal gain. Whether or not our surmise is correct, the critical point remains that grievant has failed to present sufficient evidence to make the case that any of the actions taken by the Department during this eighteen-month period were in the nature of reprisals for his whistle-blowing activities.

We recognize that grievant's lack of even one EER for this period was not career-enhancing. But we accept the Department's contention that part of the blame for this situation must be borne by grievant whose curtailed [post] assignment, for alleged misconduct, made necessary his assignment to an overcomplement position. In view of this fact, we do not find that the length of the period in question, and the attendant circumstances, are sufficient to compel the Department to provide a remedy for the insufficiency of evaluative material in grievant's OPF.

3. [Post]

It seems quite likely that grievant's services were not fully utilized during his [post] tour, and that he was by-passed on a number of occasions. Support for this conclusion comes from the statements of a number

In response to [Grievant]'s supplemental submission, the Department alleges that grievant introduced new allegations not raised in the initial grievance, namely that the low ranking statement "invents passages" and "takes comments out of context." The Department states that these new allegations were improperly introduced and should be dismissed as procedurally deficient. The Department argues that the new allegations should have been readily apparent before the initial grievance filing and criticizes the allegations as being merely an attempt to prop up grievant's original argument that the ambassador's presence undermined the integrity of the promotion panel.

## IV.    DISCUSSION AND FINDINGS

We turn first to the issue raised by grievant concerning the participation of Ambassador [Name] in the 1997 Selection Board proceedings which resulted is his being low-ranked. We find that grievant has clearly establi[He/She] d that [He/She] and he were participants in an adversarial relationship that persisted over a considerable period of time, including an acute phase in mid 1997, which coincided with the period in which the Ambassador chaired the Selection Board which rated [Grievant].

Grievant has presented credible evidence in the form of affidavits from two senior officials of [[[NAME OF BUREAU]]] attesting to the Ambassador's hostile attitude toward him, as expressed in meetings with each of them. Deputy Assistant Secretary [Name] said of his meeting with [his/her] in Santo Domingo in June, 1997, that he had concluded that the Ambassador "had developed strong personal negative views regarding Mr. [Grievant] in advance of [his/her] participation in the Department of State Promotion

Boards. Given the bias against Mr. [Grievant] [He/She] clearly articulated when [He/She] expressed [his/her] unhappiness with Mr. [Grievant] to me, I was surprised to learn that [He/She] did not recuse herself from participation in the Promotion Board when the Board came to consider Mr. [Grievant]'s promotion."[3] During the Department's consideration of [Grievant]'s grievance, [Name] was asked to explain why he believed that the Ambassador's negative views about [Grievant] were personal rather than an expression of [his/her] professional disagreement. He replied, according to the Department, that he "knew Ambassador [Name] did not like Mr. [Grievant] because [He/She] had told him so during the June conversation. The second official, Principal Deputy Assistant Secretary [Name], said that the Ambassador "expressed anger and hostility toward Mr. [Grievant]" in their conversation in early July, 1997, in the Department. This conversation occurred during the tenure of the SB, which had convened on June 24.

Grievant also presented evidence of various measures directed at him by the Santo Domingo embassy. He was excluded from meetings and social events organized by the Ambassador for [Name] during the June visit, on which [Grievant] had accompanied him. In late July the embassy denied [Grievant] clearance to visit the [Post] on official business. [Grievant] said [[[NAME OF BUREAU]]] subsequently raised in a message to the post its disappointment with its failure to provide various elements of support for [Grievant], including provision of office space, when he was in Santo Domingo.

The merits of the ongoing dispute are not at issue in this proceeding, and we have no opinion about them. However, the record establi[He/She]s

---

[3] The Department decision letter to [Grievant] said this conversation occurred before she was appointed to serve on the 1997 SB. In fact, she was advised of her appointment in a telegram from the Department dated April 1, 1997. The conversation took place about June 8, 1997.

FSGB. NO. 98-096

that Ambassador [Name] was a participant in an adversarial relationship with [Grievant] in which [He/She] manifested feelings about him that were interpreted by [his/her] interlocutors -- also [Grievant]'s superiors -- as negative, biased, angry and hostile. This adversarial relationship was contemporaneous with the tenure of the SB that [He/She] chaired and which was charged with ranking [Grievant] against other members of his class.

This finding raises a question as to whether in these circumstances [Grievant] could receive the fair and impartial consideration to which he was entitled. This question cannot be answered definitively, in large part because of the nature of the selection process. Proceedings are held <u>in camera</u> and no records are kept of deliberations. The participants are the only available witnesses and may not reliably recall months or years later specific details of a process which may last several weeks and deal with many files (in this case, 412), particularly since at the time they would have had no reason to believe that such details might be significant.

As to what occurred during the SB deliberations concerning [Grievant], the record is very thin. The SB members who responded to grievant's interrogatories denied knowledge of any attempt by the Ambassador to impede [Grievant]'s advancing in the Foreign Service. Ambassador [Name] said that [He/She] could not recall the initial vote on [Grievant]'s promotability or any of the specifics of his case. [He/She] observed that the nature of the process is such that it is impossible for any one member to manipulate the board for any personal objective.

The Department pointed out, in rejecting the grievance, that the 1997 SB Precepts leave the question of recusal to the judgment of an individual member. Since Ambassador [Name] did not request recusal, the Department said, it can be concluded that [He/She] did not believe that [He/She] may

FSGB. N0. 98-096

have been unable to render fair and unbiased judgment. It concluded that [He/She] was able to and did set aside personal feelings about an officer under review. The Department also argued that the well-establi[He/She]d presumption that Selection Board members will comply with their Precepts, absent evidence to the contrary, should obtain in this case.

We note that the precepts refer to instances of a "prior" adversarial relationship or conflict but are silent concerning contemporaneous instances, thus raising the question of their application in this case. We believe that the existence of a contemporaneous adversarial relationship presents an even more acute problem for a member than a prior one and strengthens the view that recusal is indicated in such a case. Obviously, it is up to individual panel members to be aware of conflicting or adversarial relationships and to judge whether they can evaluate a service member fairly and impartially. However, this judgment is subject to review on its merits, when it is challenged on the basis of credible information concerning a conflict. Were this not the case, a member of the service would have no protection against an abuse of discretion. Similarly, the presumption of regularity is rebuttable. In the instant case, we find that the existence of a substantial adversarial relationship between a panel chairperson and grievant at the time of the panel's deliberations to be a sufficient basis to rule that the presumption has been rebutted in this case.

The Department argued that other board members would necessarily have had to join in an alleged conspiracy to damage [Grievant]'s career, and that there is absolutely no evidence to support such an assertion. This argument is off-point. [Grievant], while asserting that Ambassador [Name]'s presence on the panel corrupted it, made no allegations concerning actions by other members of the Selection Board. Nor would it be necessary from him to

81

establish that some sort of conspiratorial action occurred. [Grievant] was entitled to the expectation that <u>each</u> member of the Selection Board could render fair and impartial consideration of his file. The participation of even one hostile panel member could unfairly disadvantage an officer in the competition with his peers.

The Department held in its decision that even if it were the case that Ambassador [Name] personally disliked [Grievant] this would not require a decision to recuse, under the Precepts. It said that an impossible burden would be placed on the selection process if "every member of a Selection Board would be investigated to ensure that they do not have personal feelings about the officers they will be reviewing."

We agree generally with that proposition; a standard establishing a concept as vague as personal feelings as a threshold for consideration of recusal would be an unreasonable burden on the selection process. However, the Precepts are more specific; they identify "real or apparent conflicts of interest and prior adversarial relationships" as the indicators to which Selection Board members must be alert. In the instant case the adversarial relationship is both real and apparent.

The purpose of recusal is to protect an individual against judgments which may be tainted -- consciously or unconsciously -- by bias or hostility and so to assure that the process in which judgments are made is fair and impartial and is seen to be so. The Congress made clear its expectation in the Report of the Committee on Post Office and Civil Service on the Foreign Service Act of 1980, H.R. REP. No. 96-992 pt. 2 at 16 (1980), in its statement of the purposes of the act:

> The Committee expects that class ranking, promotion, awards of performance pay, denials of step increases, renewals of career



extension contracts, and other significant personnel actions will be based on the objective judgment of broadly representative selection boards, so that political pressure and personal pique do not affect the process.

The importance of the appearance of propriety in the conduct of the important business of review of service members is recognized in the language of the precepts, which identify both real and apparent conflicts as possible triggers for a decision to recuse. An apparent conflict is one that could cause a reasonable observer to question whether a process of judgment was compromised by the participation of a party to a dispute involving a person being judged. The remedy in cases that give rise to an appearance of bias is recusal.

The Board has ruled on a number of cases involving allegations of hostility or bias on the part of SB members. In six such cases, FSGB Nos. 76-341 (April 1, 1977), 87-52 (November 29, 1988), 91-44 (March 12, 1992), 93-46, (December 1, 1993), 95-53 (December 1, 1996) and 97-91 (May 12, 1998), the Board found that grievant failed to provide persuasive evidence of bias or animosity. In the absence of a showing of any other irregularities, the grievances were denied. The instant case can be distingui[He/She] d from the previous cases in a number of respects. The claims in the earlier cases all alleged denial of promotion; the instant case involves a low ranking. In none of the earlier cases did the Board find credible evidence of serious bias or animosity on the part of an SB member. And, in particular, none establi[He/She] d the existence of an adversarial relationship with an SB member that was coincident in time with the SB in question.

While we have no basis to attribute any misconduct or impropriety to Ambassador [Name], we do find untenable [his/her] position that [He/She] could simultaneously act both as chairperson of the Selection Board

83.

considering grievant's eligibility for promotion and as a participant in an adversarial relationship with him. It strains credulity that [his/her] reading of [Grievant]'s file would not be colored -- whether consciously or not -- by the existence of a serious adversarial relationship during which [he/she] expressed to credible witnesses feelings of bias, hostility, and anger toward him. We also note that this was the only occasion on which [Grievant] has been low-ranked. We conclude that Ambassador [Name]'s participation in the selection process raises a question as to the fundamental fairness of the selection process that resulted in the decision to low-rank [Grievant].

Accordingly, we find in favor of the grievant on the issue of Ambassador [Name]'s participation in the 1997 SB. Given this finding we need not consider the second issue raised by grievant, concerning the validity of the low-ranking statement itself. As relief, the low-ranking statement shall be expunged from Department records. We have no basis on which to accede to grievant's request for immediate promotion to the Senior Foreign Service. Nor do we believe an evidentiary board is warranted to determine his eligibility for a 1997 promotion. Instead, we direct the Department to grant grievant an additional year of time-in-class.

V.    DECISION

The Department is directed to:

1. Expunge the 1997 low-ranking statement from its records and substitute a mid-rank status in the relevant records.

2. Extend grievant's time-in-class by one year.

the same or other evaluations. All of these are matters of judgment and as such are barred from the grievance system by the provision of the Foreign Service Act which excludes from the definition of a grievance judgments of selection boards, the Department said.[5]

The Department also dismissed what it said was grievant's argument that some of the criticism in the [Post] EER was groundless in the first place. In support of this argument grievant had cited passages from past EERs and his 1998 EER and provided statements from two officers attesting to the high quality of his work in [Post]. The Department said these materials did not provide "any basis for invalidating the critical comments of some supervisors who found [Grievant] wanting in terms of collegiality, geniality, and political reporting."

## IV.   DISCUSSION AND FINDINGS

The issue before the Board in this case is whether grievant has shown by the preponderance of the evidence that there was harmful procedural error in the decisions to low rank him and to designate him for selection out; specifically, whether he has established that the evidence cited by the boards in support of their conclusions fails to meet the standards required by the precepts.

While grievant has focused his appeal on the 1997 SB action and the [Post] report, we will consider the actions of the two SBs and the PSB because all drew on the same set of EERs -- those from 1991 to 1997 -- for the

---

[5] 3 FAM 4412 provides that the judgments of selections boards and performance standards boards are not grievable, with the exception that alleged procedural violations of law, regulation, or collective bargaining agreement or prohibited personnel practice arising under those procedures are grievable.

65

documentation supporting their conclusions.  The Department decision rejecting the grievance held that all three had followed their precepts.

Selection Board precepts require that inadequacies that lead to low ranking be documented by examples of performance.  Performance Standards Board precepts require them to "weigh heavily documented shortcomings in one or more skills, abilities, or knowledges that are pertinent to the occupational category of the member reviewed."

In both cases, the boards are instructed to base their decisions on findings concerning inadequacies and shortcomings in performance.  The SB precepts also identify eight areas in which inadequacies should adversely affect promotion and which "may, of themselves, be grounds for a low ranking."[6]

We also note that, as we observed in our Decision in FSGB 96-013 (February 13, 1997), a "recommendation to separate an employee is held to a higher standard than the criteria used by a selection board to low rank an employee or refer him/her to a performance standards board ... they simply are not the same in terms of severity of outcome."

In the instant case most of the evidence of shortcomings in performance cited by the three boards was drawn from the AFI sections of grievant's EERs.  However, the instructions for EER preparation do not define areas for improvement as inadequacies in job performance:  "In assessing <u>relative</u> weakness, emphasize areas where improvement would most enhance overall effectiveness in the present job or better prepare the employee for advancement to greater responsibilities.  Explain what the employee realistically would be

---

[6] They are: reluctance to accept responsibility; failure to carry out properly assigned tasks within a reasonable time; low productivity or work poorly done; failure to adapt to the office environment or to a foreign culture; refusal to accept or carry out legitimate directives from properly authorized officials; inability to work effectively and cooperatively with supervisors, colleagues, teammates, or subordinates; a lack of EEO sensitivity; indifference/failure to carry out supervisory responsibilities.

86

expected to do to improve" (Emphasis added). In this definition, identification of a "relative weakness" is a statement of how one can improve but not necessarily that one has fallen short in performance. All EERs must identify at least one area for improvement, recognizing -- in the words of the instructions -- that "no one is perfect". Thus, a comment in the AFI section cannot be taken as prima facie evidence of an inadequacy in performance.[7]

This presents a difficult challenge for selection boards -- and for this panel, as the dissent memorandum attached to this Decision indicates -- particularly since the boards now are required to low-rank five per cent of the officers they review for promotion. They are required to distinguish among comments that are trivial or poorly enunciated and those that identify real inadequacies and shortcomings in performance -- and thus meet the precept standards for documented examples. The pressure of the five per cent requirement may cause boards to misapply their precepts for the sake of meeting that quota, as we pointed out in our Decision in FSGB 99-009 (November 30, 1999).

In our view, the definition offered in the Department's decision of what constitutes an adequate standard for specificity of examples cited in the AFI section is deficient in that it appears to assume that any AFI comment is per se a criticism and meets the precept standard for evidence of inadequacy if it is reasonably specific in identifying a general area and providing an illustration. We believe that the issue of whether an AFI comment meets the standard

---

[7] In FSGB 99-029, we observed that "Since the AFI section does not only address deficiencies in job performance, comments in that section are not *prima facie* evidence of problems in job performance." Earlier, in FSGB 86-074, we said that the assessment of "relative weakness" in the context of the AFI section "is based on an appraisal of each employee's individual performance. A person could be well above the standard of his or her peers in a particular ability and still be able to improve. For this reason the Board finds that comments in (the AFI section), standing alone, do not provide a sufficient basis for the PSB to comply with the requirements of its precepts to determine relative performance in comparison with other members in the same class and occupational category."

FSGB 99-013

should be considered in the context provided by the full report and whether or how an AFI comment relates to an identified shortcoming in job performance. Without indications in the EER of such linkage, the assumption that an AFI comment is evidence of an inadequacy of performance is weakened; it is further weakened if there is contrary evidence in the rest of the EER.

We turn now to a review of the AFI comments which figured in the low rankings by the selection boards. They deal with interpersonal skills and drafting skills. Comments in the former category concern two aspects, demeanor and communication with co-workers.

AFI comments on demeanor are found in the 1991, 1996 and 1997 reports. The Department has agreed that the 1997 "impatience" comment is not supported. We agree. With respect to the 1996 "a little gruff" comment, we consider it to be equally unsupported. Whatever critical force it might have had was vitiated by the next sentence of the comment, which was not included in any of the three board statements: "After mentioning it to him, I have seen him successfully avoid this, and in fact his colleagues in [Post] with whom I spoke, uniformly regard him as a friendly, relaxed person." The comment has no support elsewhere in a highly laudatory EER.[8] This AFI comment -- read in its entirety -- cannot reasonably be classified as probative evidence for a judgment of an inability to work effectively with his colleagues.

With respect to the 1991 comment, the balance of the report contains no reference to any problem with demeanor or interpersonal skills. The report rates [Grievant]'s performance as highly praiseworthy, singles out interpersonal skills for praise in its discussion of performance and states specifically that he

---

[8] The evaluation of grievant's interpersonal skills said in pertinent part, "[Grievant] did the kind of job in [Post] which could have easily earned him some enemies. Yet...I found that he was exceedingly well-liked and respected by superiors and subordinates."

FSGB 99-013

a procedural error occurred, a grievant need not prove that the error definitely was a factor in the agency's action but only that it may have been a factor.

The evidence in the record supports the conclusion that the 1998 Selection Board based its LRS solely on comments contained in the AFI sections of the six EERs, and that three of these sections did not contain actual examples of inadequate performance. The Department submitted no argument refuting [Grievant]'s allegation that this fact discredited the underlying foundation of the 1998 LRS.

The Board concludes that the 1998 PSB committed a procedural error in issuing a LRS in which fully half of the identified weaknesses in performance were not, as required by the precepts, supported by example. Having reached this conclusion, the Board must now determine whether the error was of such a nature that it may been a substantial factor in the Selection Board's decision to low-rank [Grievant].

The Foreign Service personnel system is very competitive, given its "up or out" nature. Once a selection board determines that an individual has not met the standards of that employee's class, the employee faces the prospect of low-ranking and mandatory separation. In performing its review of the files, a selection board is confronted with a very difficult task in identifying those individuals whose performance warrants low ranking. At times it appears that the slightest perceived fault in the performance of an employee by a

selection board is the difference between being mid-ranked or low-ranked.
Escalating the difficulty faced by each selection board in identifying
individuals for low-ranking is the requirement set by Congress that each
board low-rank 5% of the individuals whose files it reviews.

Given our determination that the selection board violated the precepts
in its analysis, we further conclude that this error may well have been a
substantial factor in the 1998 Selection Board's decision to low-rank
[Grievant].

Accordingly, the burden of proof shifts to the agency to show by a
preponderance of the evidence that the grievance is not meritorious. In its
response, the Department failed to address [Grievant]'s assertion that the
underlying foundation of the 1998 LRS was tainted given that three of the six
AFI sections cited therein did not contain actual examples. The Board
concludes that the agency failed to meet its burden of proof on this issue.
Having concluded the LRS was procedurally flawed, we will order it
expunged.

The Board has addressed this issue before and ordered similar relief.
For example, in FSGB 99-029 (October 15, 1999), the Board directed that a
low ranking be rescinded because it was not based on comments adequately
documented by examples. In FSGB 2000-09, (May 9, 2000) the Board
directed that a low-ranking statement be rescinded as it was not consistent
with the precepts and regulations.

A motion to reconsider shall be based on (1) an intervening change in controlling law, (2) availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice . . . . Absent extraordinary circumstances, revisiting the issues already addressed is not the purpose of a motion to reconsider. *In re: American Freight Systems, Inc., Debtor*, 213 B.R. 914 (D. Kan. 1997).

*See* FSGB Case No. 1998-021 (Order: Attorney Fees, September 1, 2004, at p. 5).

In the circumstances presented here, the Board finds that the March-August 2001 EER does not constitute "newly discovered or previously unavailable material evidence."

The copy of the EER submitted with the Motion does not indicate when it was first provided to {Grievant}. Part I, Certification - Work Requirements and Counseling, states that the "Work requirements were established by rater, reviewer,[3] and employee on 04-15-01" and that a counseling session took place during the rating period (March 1 through August 29, 2001). {Grievant} signed Part I, acknowledging the work requirements and the counseling session, on May 24, 2002. He signed Part IV, Statement by Rated Employee, which included a statement acknowledging receipt of the EER, on April 9, 2002. These signatures establish, therefore, that {Grievant} was in possession of the EER approximately one year before he filed his original agency-level grievance in May 2003. The fact that he may have misplaced this EER, or forgotten that it contained a specific work objective to "Further develop commercial opportunities for U. S. companies with the {Blank} and its agencies", and only reacquainted himself with its contents in the course of preparing for his involuntary retirement in 2006, does not make the document "newly discovered or previously unavailable material evidence."

{Grievant}'s assertion that the Board had access to all of his files and should have obtained and made use of this March-August 2001 EER is largely irrelevant. The Board

---

[3] There was no reviewer for this EER.

6

FSGB 2003-038

is an adjudicatory, not an investigative, body.  It is the obligation of the parties to an appeal to create the record, including both evidence and argument, on which our decisions are based.

Even if this EER had been in the Record of Proceedings, the Board would still have denied the grievance concerning the IER.  In this connection, {Grievant} misreads the Board's March 2005 Decision.  Our principal reason for denying that portion of the appeal was our conclusion that the judgment of the inspection team that the "grandiose Independence Day celebration" in 2001 was "overblown" was not shown to be erroneous or falsely prejudicial.  As we said in our Decision:

> In both the draft and final inspection report, the inspectors laud the Embassy for pursuing limited U. S. business sales to the {Blank}, but note the Embassy had exaggerated the potential benefit of such trade promotion to justify fund raising for representational events from U. S. firms. Faulting grievant for what it considered to be excessive fund raising activities was an OIG judgment call well within its mandate.  {Grievant}'s disagreement does not make the judgment call erroneous or falsely prejudicial.  (*See* pp. 20-21)

Our additional observation that "[a] very large promotion event funded by U. S. business interests in celebration of our Independence Day is not listed among grievant's work requirements" was based on the record before us at the time.  It reinforced, but was not necessary for, our conclusion that the IER statements were not erroneous or falsely prejudicial.

## V.    ORDER

The Motion for Reconsideration is denied.

FSGB 2003-038

We also established a schedule for propounding and responding to discovery requests.

We memorialized the foregoing in a memorandum of April 26 (corrected May 14).

The parties have initiated the discovery process. This Order addresses the

motions to compel discovery filed by each of the parties.

## III.    CHARGED EMPLOYEE'S MOTION TO COMPEL DISCOVERY

### Background

{Grievant} served his discovery requests on the Department in four separate

documents on May 7:

- Petitioner S/A {Name} {Grievant}'s First Set of Interrogatories to the Department of State posed 94 questions.

- Petitioner S/A {Name} {Grievant}'s First Request for Admissions to the Department of State. {Grievant} did not present any requests in this document; he stated that it would be premature to do so because, "it remains unclear that the State Department is prepared to admit, or to stipulate, to anything in this grievance proceeding that favors the Petitioner".

- Petitioner's Designation of Witnesses for Hearing, Interview or Deposition listed the names of 38 persons, plus a 39th item "Any individual identified on any other parties' witness list". {Grievant} identified himself as a potential witness (at item 27), with the comment "if statements may not be used against him in any criminal prosecution or extradition".

- Petitioner S/A {Name} {Grievant}'s First Request for Production of Documents to the Department of State asked for 92 documents, computer files, or tangible objects.

The Department submitted a Motion to Strike {Name} {Grievant}'s First Set of

Interrogatories, First Request for Production of Documents, and Designation of

Witnesses on May 12. {Grievant} submitted, through counsel, Petitioner's Opposition to

Motion to Strike on May 13. In an Order: Motion to Strike of May 24, the Board denied

6

93

{Charged Employee} asks that we deny the <u>Motion to Strike</u> and order the Department to adhere to the timelines established on April 22 and provide answers (or objections thereto as appropriate) to the discovery requests he has propounded.

## III.    DISCUSSION

### Board Authority and Standards

The Board's statutory authority to address questions involving discovery is found in section 1108 of the Foreign Service Act; our implementing regulations, which track closely with the Act, are found at 22 CFR §903.9. Under the Act, the Board is empowered to request access to any agency record requested by a grievant (or, as in this case, a "charged employee" -- see 22 CFR 901.17) "if the Board determines that such record may be relevant and material to the grievance."

### Documents

The Board's guidelines do not set any arbitrary limit on the number of documents that may be requested in discovery. All such requests must, however, conform to the statutory and regulatory standard that they be "relevant and material". A party may refuse to produce a requested document (or physical object) on grounds that the document (or object) is not relevant or material to the issue in the case, or where to do so would be unduly burdensome or unnecessarily duplicative, or where it would violate a recognized privilege (such as the attorney-client privilege).

### Interrogatories

Under our guidelines, the Board may allow interrogatories in excess of 30 if there is "good cause" to do so. In light of the seriousness and complexity of the issue in this

case -- separation from employment -- we find that there is good cause to allow

94

interrogatories without any arbitrary limit. As with documents, a party may refuse to respond to an interrogatory on grounds that the response is not relevant or material to the issue in the case, or where a response would be unduly burdensome or unnecessarily duplicative, or where a response would violate a recognized privilege (such as the attorney-client privilege).

Designation of Witnesses

The list of witnesses submitted by {Charged Employee} contains names but no other identifying information (such as address, job title, or office affiliation). Additionally, there is no indication as to what the nature of the testimony of these individuals would be, or how such testimony is likely to lead to information relevant to the Board's deliberations. Without this clarifying information, the Department cannot properly respond.

IV.    ORDER

- The Department shall respond to {Charged Employee}'s requests for documents and interrogatories as submitted by him in accordance with the timelines of the Board's April 26, 2004 memorandum. Those responses may, as the Department deems appropriate, include refusals to provide the requested information on such grounds as are described above. To the extent the Department's <u>Motion to Strike</u> involves interrogatories and requests for documents, it is denied.

7                                    FSGB 2004-005

95

## II.    DISCUSSION

Ambassador {Name} made numerous critical comments about grievant's performance in the EER at issue.  Grievant alleges the comments are inaccurate and falsely prejudicial and, that they were written by the Ambassador out of a sense of vindictiveness and animus toward her for her refusal to perform unethical assignments that were far beyond the duties of her position at post.

Grievant bears the burden to establish, by a preponderance of evidence, that her grievance is meritorious.  One way she can attempt to do this is via discovery, to obtain relevant information not readily available through informal inquiry.  Considering the nature of her allegations, grievant contends that documents and reports relating to any OIG investigation, inspection, or Inspector's Evaluation Report (IER), conducted on Ambassador {Name} during his tenure at Embassy {Blank} might be relevant and material to her grievance.

Under Section 1108(b) of the Foreign Service Act, the Board is authorized access to any agency record if it determines that the record "may be relevant and material to the grievance."[1]  We have previously determined that this Board has jurisdiction over OIG documents or reports.  "It is the Board, not a party to a dispute, which has the authority to determine relevance and materiality.  The relevancy threshold in discovery is not high.  Grievants have a right to information that appears reasonably calculated to lead to admissible evidence . . ."[2]  Here, we find that, given the nature of the grievant's claims in this case, reports relating to any OIG report of investigation, inspection or IER that

---

[1] The Act contains certain exceptions, which are not relevant here.
[2] *See* FSGB Case No. 2000-079 ORDER: Motion to Compel, March 19, 2001, which cited FSGB No. 99-063 ORDER: Jurisdiction, December 30, 1999, which relied on *NASA v. FSLA* 527 U.S. 229, June 17, (1999).

FSGB 2004-037

action on the matter at issue, or from taking such further actions as may be contingent on that initial action. (There are two groups of exceptions to this basic principle, which we address below.) As discussed above, {Grievant} has not pointed to any law, rule, published policy, or CBA provision that prevented the agency from presenting the EER at issue to a SB while his challenge to it is pending before the EEOC.

An aggrieved member of the Foreign Service may not appeal a grievance to this Board until the agency has had an opportunity to review and rule on the matter being grieved, unless the agency fails to do so within 90 days, in which case the grievance may then be appealed to this Board. It is only after an appeal has been presented to the Board, and after we have established that we have jurisdiction over it,[3] that we have any authority to order the agency to take any action. We could not, therefore, have directed the agency not to present the challenged EER to a SB even if {Grievant} had requested that we do so at the same time that he submitted his challenge to the EEOC.

This Board is granted certain remedial powers (*see* Section 1107(b) of the FSA). These come into play only after a matter has been properly appealed to the Board and we have determined that the appeal is meritorious. As we have noted, however, there are two categories of exceptions to the above-described principle that an agency is free to act, and to complete whatever subsequent actions it deems appropriate, with remedies in meritorious cases being imposed only retrospectively:

- An agency may not separate a member of the FS for cause (*see* Section 610 of the FSA), until the member has first had a hearing before this Board (unless the member waives that right).

---

[3] We must determine, among other things, that the grievant/appellant has standing to file the appeal, that the appeal (and possibly the original grievance itself) was timely filed, and that the subject matter is within our jurisdiction.

FSGB 2004-070

- This Board may order interim relief for up to one year from an agency proposal to separate a member involuntarily (other than for cause), to discipline the member, or to recover monies from a member (*see* Section 1106(8) of the FSA).[4]

The fact that Congress authorized this Board to act prior to the taking of an agency action in certain specified circumstances is a clear indication that Congress did not intend to give the Board broader authority to order stays of agency actions.

The Board is aware that its remedial powers, as enumerated in Section 1107(b) of the FSA, particularly in cases involving assignment, tenure, and promotion, may not perfectly remedy the harm to an aggrieved member. Congress itself recognized the limitations of the remedial powers conferred upon the Board. Section 1107(d) of the FSA provides:

> If the Board finds that the grievance is meritorious and that remedial action should be taken that relates directly to promotion, tenure or assignment of the grievant or to other remedial action not otherwise provided for in this section, or if the Board finds that the evidence before it warrants disciplinary action against any employee of [an agency] or member of the Service, it shall make an appropriate recommendation to the [head of the agency] . . . .

The Board's awareness of the limitations of its remedial powers, including awareness that certain remedies may not fully compensate for the actual harm done to an employee, is not sufficient reason for the Board to assume an authority that Congress has not conferred on us.

Having determined that we lack the authority to order the type of stay {Grievant} proposes, we find it unnecessary to weigh the relative harms to the parties of allowing or

---

[4] We note that the Board's authority to order interim relief from involuntary separation of a member of the FS was removed from the FSA between September 30, 2002 [Pub. L. 107-228] and December 22, 2005 [Pub. L. 109-140], and would not have been available to delay {Grievant}'s separation from the FS in any event.

FSGB 2004-070

98

not allowing a SB to review a challenged EER, or otherwise comment on how we might exercise such an authority.

Whether the Board should be granted the authority to order stays in cases such as {Grievant}'s (or in any other circumstances not currently provided for in law), and if so how such authority should be exercised, are legitimate policy questions.  They are more properly raised by submission to the agency or to Congress than in a grievance appeal to this Board.

## V. DECISION

The grievance appeal is denied.

FOREIGN RELATIONS.

22 § 4136

VII, Subtitle A (§§ 7101 to 7122), to take effect on Dec. 17, 2004, see Pub.L. 108–458, § 7122, which is set out as a note under 1 U.S.C.A. § 112a.

---

VICE RETIREMENT AND DISABILITY

RETIREMENT AND DISABILITY SYSTEM

D STATUTORY NOTES

the Secretary shall provide due process in implementing this section.

"(b) Waiver.—The Secretary of State may waive the applicability of subsection (a) on a case-by-case basis with respect to an employee if he determines that it is vital to the national security of the United States to do so and he reports such waiver to the appropriate committees of the Congress."

[For termination, effective May 15, 2000, of reporting provisions pertaining to waiver of termination of retirement benefits for foreign national employees engaging in hostile intelligence activities, see Pub.L. 104–66, § 3003, as amended, set out as a note under 31 U.S.C.A. § 1113, and the 8th item on page 129 of House Document No. 103–7.]

ns

ND STATUTORY NOTES

see Pub.L. 104–66, § 3003, as amended, set out as a note under 31 U.S.C.A. § 1113, and page 127 of House Document No. 103–7.

L, LEAVE, AND OTHER BENEFITS

me for text of (a) to (f)]

partment of State for funding the costs of medical family members shall be credited to the currently unt. Such reimbursements shall be available for fiscal year in which they are received or for such ed in law.

0, 94 Stat. 2127; Pub.L. 99–93, Title I, § 122, Aug. 16, § 243, Jan. 8, 1988, 101 Stat. 1776; Pub.L. 107–228, Div. 1379; Pub.L. 109–140, § 2, Dec. 22, 2005, 119 Stat. 2650.)

AND STATUTORY NOTES

ub.L.

RY REFERENCES

United States ⪦39(1).
Key Number System Topic Nos. 26, 393.

14

---

## SUBCHAPTER XI—GRIEVANCES

### § 4131. Definitions and applicability

#### Notes of Decisions

**3. Grievance**

No *Bivens* remedies existed for alleged violations of foreign service officer's constitutional rights by State Department officials; comprehensive nature of the Foreign Service Act's

(FSA's) grievance procedures provided officer with an avenue for some redress, which foreclosed judicial imposition of a new substantive liability. Thompson v. Pope, 2005, 397 F.Supp.2d 28. United States ⪦50.10(4)

### § 4136. Foreign Service Grievance Board procedures

The Board may adopt regulations concerning its organization and procedures. Such regulations shall include provision for the following:

*[See main volume for text of (1) to (7)]*

(8) If the Board determines that the Department is considering the involuntary separation of the grievant (other than an involuntary separation for cause under section 4010(a) of this title), disciplinary action against the grievant, or recovery from the grievant of alleged overpayment of salary, expenses, or allowances, which is related to a grievance pending before the Board and that such action should be suspended, the Department shall suspend such action until the date which is one year after such determination or until the Board has ruled upon the grievance, whichever comes first. The Board shall extend the one-year limitation under the preceding sentence and the Department shall continue to suspend such action, if the Board determines that the agency or the Board is responsible for the delay in the resolution of the grievance. The Board may also extend the 1-year limit if it determines that the delay is due to the complexity of the case, the unavailability of witnesses or to circumstances beyond the control of the agency, the Board or the grievant. Notwithstanding such suspension of action, the head of the agency concerned or a chief of mission or principal officer may exclude the grievant from official premises or from the performance of specified functions when such exclusion is determined in writing to be essential to the functioning of the post or office to which the grievant is assigned.

*[See main volume for text of (9)]*

(Pub.L. 96–465, Title I, § 1106, Oct. 17, 1980, 94 Stat. 2145; Pub.L. 101–167, Title V, § 586(a), Nov. 21, 1989, 103 Stat. 1252; Pub.L. 102–138, Title I, § 143(b), Oct. 28, 1991, 105 Stat. 668; Pub.L. 103–236, Title I, §§ 177(a), 181(a)(4)(B), Apr. 30, 1994, 108 Stat. 414, 417; Pub.L. 107–228, Div. A, Title III, § 314(b), Sept. 30, 2002, 116 Stat. 1379; Pub.L. 109–140, § 5, Dec. 22, 2005, 119 Stat. 2652.)

### HISTORICAL AND STATUTORY NOTES

**Amendments**

**2005 Amendments.** Par. (8). Pub.L. 109–140, § 5, in the first sentence, inserted "the involuntary separation of the grievant (other than an

involuntary separation for cause under section 4010(a) of this title)," following "considering", and struck out "the grievant or" and inserted "the grievant, or".

### CODE OF FEDERAL REGULATIONS

Board procedures in general, see 22 CFR Chap. IX.
Burden of proof, see 22 CFR § 905.1 et seq.
Initiation of cases, see 22 CFR § 903.1.

Mandatory hearings, see 22 CFR § 906.2.
Records of agency, access to, see 22 CFR § 903.9.

### LIBRARY REFERENCES

**American Digest System**

United States ⪦36.
Key Number System Topic No. 393.

**Research References**

**Encyclopedias**

Am. Jur. 2d Labor and Labor Relations § 573, Jurisdiction of the Foreign Service Grievance Board.

**Treatises and Practice Aids**

Federal Procedure, Lawyers Edition § 36:59, Jurisdiction of Foreign Service Grievance Board.
Federal Procedure, Lawyers Edition § 36:64, When Hearing Must be Held.

15

members designated by the Chairperson, except that hearings within the continental United States shall be held by panels of at least three members unless the parties agree otherwise. References in this subchapter to the Board shall be considered to be references to a panel or member of the Board where appropriate. All members of the Board shall act as impartial individuals in considering grievances.

(8) If the Board determines that the Department is considering disciplinary action against the grievant or recovery from the grievant of alleged overpayment of salary, expenses, or allowances, which is related to a grievance pending before the Board and that such action should be suspended, the Department shall suspend such action until the date which is one year after such determination or until the Board has ruled upon the grievance, whichever comes first. The Board shall extend the one-year limitation under the preceding sentence and the Department shall continue to suspend such action, if the Board determines that the agency or the Board is responsible for the delay in the resolution of the grievance. The Board may also extend the 1-year limit if it determines that the delay is due to the complexity of the case, the unavailability of witnesses or to circumstances beyond the control of the agency, the Board or the grievant. Notwithstanding such suspension of action, the head of the agency concerned or a chief of mission or principal officer may exclude the grievant from official premises or from the performance of specified functions when such exclusion is determined in writing to be essential to the functioning of the post or office to which the grievant is assigned.

(9) The Board may reconsider any decision upon presentation of newly discovered or previously unavailable material evidence.

That said, the evidence relied upon by the agency in making its determination of "willful misuse of GOV" is the same evidence that has been made available to the grievant; i.e., the post vehicle logs . . . . Further, all the Department regulations, the corresponding Code of Federal Regulations, and post policy that would have been what was relied upon in making determinations on use of GOV at the time (1998-2001) have been made available to the grievant. And finally, the grievant has not demonstrated how any of the information sought would have a "probable effect" on the "organization and presentation" of their case.

## II. DISCUSSION AND FINDINGS

Pursuant to the Board's regulations at 22 CFR Section 903.6, "Each party shall be entitled to serve interrogatories upon another party and have such interrogatories answered by the other party unless the Board finds such interrogatories irrelevant, immaterial or unduly repetitive." The Board's *Policies and Procedures Regarding Discovery* provide that "Relevant and material information is that which tends to prove or disprove a fact that may affect the disposition of a grievance." The Supreme Court has stated that "relevant" information for the purposes of discovery has been construed broadly to include "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978), *Hayes v. Department of Health and Human Services*, 829 F. 2d 1092, 1103 (Fed Cir. 1987). What constitutes "relevant information" should be subject to a liberal interpretation. *Hickman v. Taylor*, 329 U.S. 495 (1947).

"[A]ny uncertainty should be resolved in favor of the movant absent any undue delay or hardship caused by such request." *Bize v. Department of the Treasury, 3 M.S.P.R. 155, 164 (1980).* In making the determination whether a discovery request is so broad and all-inclusive as to be unduly burdensome, courts weigh the burden on the interrogated party against the benefit to the party submitting the discovery request of

102

having the information. See *Flour Mills of America, Inc. v. Pace, 75 F.R.D. 676, 680 (E.D. Okla. 1977)*

The grievant's original discovery request included 19 interrogatories. The grievant is challenging five of the agency's responses as being non-responsive or inadequate.

> Interrogatory 1: *Identify and list the names/ranks and positions of all officers in overseas missions who received U.S. Government ("USG") home to office transportation during the period 1993-2001 and indicate whether, when and in what amount per trip payment was made by such persons to the U.S. State Department or the officer's post for such home to office transportation.*

The agency objected to this request as being too broad, unfocused, unduly burdensome and irrelevant. It stated: "The issue is {Grievant}'s alleged misuse of a Government Owned Vehicle (GOV), not other officers."

In her Motion to Compel grievant argues that she

> . . . is entitled to know whether other officers were held to the same standard on use of a GOV for home to office, whether other officers were able to discern from the confused series of ambiguous regulations and post notices what was required of them and under what circumstances a DCM was allowed to receive use of a car for home to office transportation.

Grievant further argues that:

> Grievant is absolutely entitled to know officially whether her male predecessor and her successor were held to the same standard at the same Post, required to pay back Agency on home to office use or alerted that they needed to pay the per fee trip back at a later date with no other action taken by the Agency . . . this information is highly relevant to {Grievant}'s defense that the assessed penalty is disproportionate and constitutes disparate treatment. It is also relevant to establishing the pattern and practice at Post {Blank} to show lack of recklessness or willfulness on their part.



FSGB 2005-040

103